**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

APRIL EPPS,

      Plaintiff,

v.                                                           Case No. 12-11906
                                                             Hon. Lawrence P. Zatkoff

CHAD RICHARDSON,

      Defendant.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on September 10, 2013

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment [dkt 9]. The

Motion has been fully briefed. The Court finds that the facts and legal arguments are adequately

presented in the parties' papers such that the decision process would not be significantly aided by oral

argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the Motion be

resolved on the briefs submitted. For the following reasons, Defendant's Motion for Summary Judgment

is GRANTED.

## II. BACKGROUND

### A. FACTUAL BACKGROUND

On May 1, 2010, Plaintiff April Epps ("Plaintiff") and her two children visited the Pearl Vision

store located in Warren, Michigan for the purpose of undergoing eye examinations. The optician who

helped Plaintiff was Charles Frontera ("Frontera"). After the exams, Plaintiff ordered a pair of Gucci

eyeglasses for herself and new lenses for her daughter.  Before leaving Pearl Vision, Plaintiff paid

$227.10 by check—a fact that neither party disputes.  Plaintiff understood this amount—at least at the

time—to be her total out-of-pocket expense, and that her insurance covered any residual balance.

Plaintiff testified that she received either a statement or a receipt on May 1, but she cannot recall whether

the document showed an owing balance, or if she was told that her payment of $227.10 was only a

portion of her out-of-pocket costs.[1]  Defendant disputes this, claiming that Frontera informed Plaintiff on

May 1 that her original balance was $454.20, less her down payment of $227.10, thus bringing her

remaining balance to $227.10.

Plaintiff returned to Pearl Vision on May 7, 2010, to pick up her eyeglasses.  Frontera checked

the fit of Plaintiff's eyeglasses, confirmed that Plaintiff was satisfied, and provided Plaintiff with a case

and carrying bag.  Unrelatedly, Plaintiff then asked Frontera if she could use Pearl Vision's facsimile

machine.  As Plaintiff was being escorted to use the machine, additional patrons came into Pearl Vision.

Frontera told the customers that he would be with them momentarily.  Frontera helped Plaintiff fax some

documents, and at some point walked over to the other customers and began conversing with them.

Plaintiff then exited Pearl Vision for a "quick second," before realizing that she needed a prescription for

her work-safety glasses.  Plaintiff reentered the store, received the prescription from Frontera (who was

helping the customers), and again exited.  Plaintiff states that at no time on May 7, 2010, did Frontera

inform her that she still had an outstanding balance.

After Plaintiff left Pearl Vision, Frontera realized that he had not collected the remainder of

Plaintiff's balance.  Frontera left several messages on Plaintiff's cellular telephone ("cell phone")

---

[1] Defendant attached to his Motion a May 1, 2010, Pearl Vision statement bearing Plaintiff's name as the customer. The statement details the services provided to, and the products purchased by, Plaintiff. Under "amount due" and "your balance," the same amount is listed: $227.10. The "amount due" would be considered late after May 21, 2010. The statement also indicates that a payment of $182.10 was applied on May 1. Regarding the payment amount, the Court is unable to ascertain why both parties continually state, and agree, that Plaintiff made a payment of $227.10 on May 1, but the statement produced by Defendant shows a payment amount of $182.10. This issue, however, is not dispositive to the outcome here.

requesting that she return to the store and pay the balance.  Plaintiff does not dispute that Frontera called

her, rather she claims that her voicemail system "had a lock on it" during this time and she was therefore

unable to retrieve any messages.

Failing to receive a response from Plaintiff, Frontera filed a complaint against Plaintiff with the

Warren Police Department on May 19, 2010.  Frontera provided a written statement, which describes as

follows:

> On 5-7-10 [Plaintiff] came to our store to pick up her eyeglasses, retailed
> at $629.  After her insurance and discounts her balance was $227.10.
> Upon dispensing the glasses to [Plaintiff], another couple came into the
> store.  While assisting the other customers [Plaintiff] took her glasses and
> left the store, making no attempt to pay for the merchandise.  I personally
> made 3 attempts to contact her and my boss made 2.  She has yet to call
> or contact the store and has not paid her balance.

Dkt. 9, Ex. 6, Witness Statement dated May 20, 2010.  The complaint was assigned to Defendant Chad

Richardson ("Defendant"), a detective with the Warren Police Department.  As part of his investigation,

Defendant and Frontera met on May 20, 2010, and Frontera "briefly" detailed the events forming the

basis of the complaint.  Frontera pointedly told Defendant that he thought Plaintiff left Pearl Vision

knowing that she had a balance due.

Subsequent to meeting with Frontera, Defendant tried making contact with Plaintiff via her cell

phone, but his attempts were unsuccessful.  Again, Plaintiff does not dispute Defendant's efforts—she

only claims that her voicemail system was inaccessible at the time.  As with Frontera, Plaintiff never

returned Defendant's calls.

On June 1, 2010, Defendant arrived at Plaintiff's place of employment.  At the direction of

Plaintiff's supervisor, Defendant returned on June 3, 2010, and was placed in a private room with

Plaintiff.  Defendant identified himself as a Warren Police Department detective and that he was

investigating a larceny from Pearl Vision.  Defendant immediately recognized that Plaintiff was wearing

3

eyeglasses that matched the description provided by Pearl Vision.  Plaintiff confirmed that these were the

Gucci eyeglasses at issue

Defendant then asked Plaintiff if she had paid for the eyeglasses, to which Plaintiff responded,

"Yes."  Plaintiff could provide no form of documentation at that time corroborating her position, but

offered to call "the credit union."  The parties dispute the sequence of events that next unfolded, and the

Court will outline the testimony of three separate individuals—Plaintiff, Defendant, and Dr. Anthony

Spitler ("Dr. Spitler"), then owner of Pearl Vision.

According to Plaintiff, she spoke with a representative—albeit unidentified—from the "Sterling

Van Dyke" credit union and that representative confirmed, over speakerphone, that a $227.10 payment

was tendered to Pearl Vision on May 1, 2010.    Defendant then telephoned Pearl Vision, but Plaintiff is

unaware to whom Defendant spoke with.  Plaintiff testified:

> "When [Defendant] verified that I paid for the check - - I mean, paid for
> the glasses with the check, he picked up the phone and I assume called
> Pearl Vision or someone there, and he stated I thought you said she
> didn't pay for - - didn't pay anything on the glasses, and the next thing I
> heard him say was, well, you're going to have to give me [*i.e.*,
> Defendant] paperwork, and in the meantime, I'll [*i.e.*, Defendant] get the
> glasses."

Dkt. 9, Ex. 1, p. 45.  Defendant then reached for Plaintiff's glasses, but Plaintiff refused to hand them

over.  In response, Defendant told Plaintiff if she did not give up the eyeglasses, that he would arrest her

for larceny.  Plaintiff then replied, "I'm not giving you my glasses because I paid for these, so you're just

going to have to arrest me."  Defendant placed Plaintiff under arrest for larceny.

Defendant's version is as follows.  Defendant admits that Plaintiff placed a call to an unidentified

institution and spoke with an unidentified woman who confirmed that Plaintiff made a payment of

$227.10 by check to Pearl Vision on May 1, 2010.  Defendant claims this conversation provided no

justification for ascertaining whether or not Plaintiff indeed paid anything for the eyeglasses.  To confirm

4

in Plaintiff's presence that the eyeglasses were stolen, Defendant called Pearl Vision and spoke with Frontera and Dr. Spitler. Both of these individuals confirmed to Defendant that Plaintiff stole the eyeglasses and both were "adamant that [Plaintiff] owed them money." Defendant asked Plaintiff to turn over the eyeglasses as evidence and she refused. Defendant reiterated his request multiple times. Finally, Defendant said, "I'm going to take the glasses and remove them from you." Defendant slowly reached for the glasses and Plaintiff smacked his hand away. Defendant describes his decision to arrest Plaintiff: "And at that point, I realized that there was not going to be cooperation in this matter. I felt that I developed probable cause that she indeed committed a larceny from a building, and I advised her that she was under arrest for that larceny."

Last, Dr. Spitler confirmed at his deposition that he spoke with Defendant on June 3, 2010, though his testimony is ambiguous as to how many times. Dr. Spitler faxed to Defendant a copy of Plaintiff's receipt. Defendant then called Pearl Vision because he "was concerned that the information [Dr. Spitler] sent him was not the exact amount of what [Plaintiff] had owed[.]" At this point, Defendant planned to take Plaintiff's eyeglasses and "was going to send [Plaintiff] to the office to straighten out th[e] [exact] balance." Dr. Spitler stated that he would inquire into the discrepancy and call Defendant back. Dr. Spitler conversed with his employees and, unbeknownst to him, was informed that Plaintiff's children's portion of the remaining balance was on different receipts. Within "five minutes," Dr. Spitler called Defendant and "faxed over the rest of the receipts." Dr. Spitler explains: "[Defendant then] said did she owe the money at the time that she had left with the product, with the glasses, I [*i.e.*, Dr. Spitler] said yes. [Defendant] said he had changed his mind, he was going to put her under arrest."

Following her arrest, a state criminal prosecution was initiated charging Plaintiff with larceny. The larceny charged was later reduced to a misdemeanor, Retail Fraud-Second Degree. Plaintiff learned that she did, in fact, have an outstanding balance with Pearl Vision, and the charges levied against her

5

were dismissed when she made restitution to Pearl Vision in the amount of $227.10.  After making the

payment in cash, Plaintiff's eyeglasses were ultimately returned.

Plaintiff filed this lawsuit against Defendant claiming Fourth Amendment violations of false

arrest and illegal seizure of property.  Defendant filed the instant motion seeking summary judgment on

all of Plaintiff's claims.

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See*

*also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the

entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial.").  A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or
> declarations, stipulations (including those made for purposes of the
> motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot produce
> admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other

materials in the record."  Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as

to a material fact, and all inferences should be made in favor of the nonmoving party.  *Celotex*, 477 U.S.

at 323.  The moving party discharges its burden by "'showing'–that is, pointing out to the district court–

that there is an absence of evidence to support the nonmoving party's case."  *Horton v. Potter*, 369 F.3d

906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

Qualified immunity protects government officials from liability "when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights." *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In *Saucier v. Katz*, the Supreme Court established a two-step inquiry for determining whether an official is entitled to qualified immunity. 533 U.S. 194, 201 (2001). The district court must consider (1) whether, viewing the evidence in the light most favorable to the injured party, a constitutional right has been violated; and (2) whether that right was clearly established. *Id.* In *Pearson v. Callahan*, the Supreme Court held that while the sequence set forth in *Katz* is often appropriate, it is not mandatory, and courts have discretion to decide which of the two prongs of the qualified immunity analysis to address first. 555 U.S. 223, 236 (2009).

Once a defendant raises the qualified immunity defense, the burden is on the plaintiff to demonstrate that the official is not entitled to qualified immunity by alleging facts sufficient to show that

the official's act violated clearly established law at the time that it was committed. *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 444 (6th Cir. 2012). "To defeat the qualified immunity bar, a plaintiff 'must present evidence sufficient to create a genuine issue as to whether the defendant committed the acts that violated the law.'" *Id.* (quoting *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994)). "To make out a *genuine* issue of material fact, plaintiff must present significant probative evidence tending to support her version of the facts, *evidence* on which a reasonable jury could return a verdict for her." *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009).

In each of Counts I and II, Plaintiff asserts claims under 42 U.S.C. § 1983 against Defendant for violation of Plaintiff's civil rights. These Counts will be discussed in turn.

### A. FALSE ARREST UNDER § 1983

Plaintiff first argues that Defendant falsely arrested her in violation of the Fourth Amendment. The Fourth Amendment guarantees citizens protection against "unreasonable searches and seizures." In order for an arrest to be reasonable within the meaning of the Fourth Amendment, it must be based on probable cause. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Probable cause in the context of an arrest is defined as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing or is about to commit an offense." *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002) (citing *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)). The existence of probable cause should be determined on the totality of the circumstances, including a "realistic assessment of the situation from a law enforcement officer's perspective." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993), *cert. denied.* 513 U.S. 828 (1994); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995). The inquiry "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "[A]fter the officer

determines, on the basis of the facts and circumstances known to him, that probable cause exists, the officer has no further duty to investigate or to search for exculpatory evidence." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007).

"Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). Here, Defendant arrested Plaintiff for larceny in a building, Mich. Comp. Laws § 750.360. Under Michigan law, the elements of larceny in a building include (1) the actual or constructive taking of goods or property, (2) the carrying away or asportation with felonious intent (3) of goods or property of another, (4) without the consent and against the will of the owner, (5) within the confines of a building. *People v. Mumford*, 171 Mich. App. 514, 517–18 (1988).

Plaintiff contends that no reasonable officer in Defendant's position could believe that the arrest of Plaintiff was justified by probable cause. To that end, the crux of Plaintiff's theory is that Defendant believed Plaintiff paid nothing whatsoever for the glasses, not that she had made a down-payment and retained an outstanding balance. This distinction is important, according to Plaintiff, because if Defendant initially assumed Plaintiff failed to make any payment, Defendant could not have possessed probable cause due to the discovery of "exculpatory" evidence on the day of the arrest. Such exculpatory evidence, Plaintiff asserts, included: (1) Plaintiff's confirmation with the credit union that she tendered a payment of $227.10 to Pearl Vision on May 1, 2010; and (2) the telephone conversation between Defendant and Dr. Spitler wherein they discussed the discrepancy over Plaintiff's exact balance for the eyeglasses. Alternatively, Plaintiff implicitly argues that Defendant ignored the exculpatory evidence.

Based on all the record evidence, the Court concludes that reasonable minds cannot dispute that Defendant had probable cause to arrest Plaintiff for the crime of larceny in a building.

First, to the extent Plaintiff is claiming that Defendant "ignored" certain exculpatory evidence, this argument is without merit. Contrary to Plaintiff's assertions, Defendant called Pearl Vision to confirm the exact amount Plaintiff owed *after* overhearing Plaintiff's telephone conversation with an alleged—though unidentified—banking institution, wherein an unidentified representative stated that Plaintiff tendered a payment to Pearl Vision of $227.10 on May 1, 2010. Thus, Defendant was well apprised of this "exculpatory" evidence at the time of the arrest and his actions certainly do not indicate that such evidence was ignored.

Next, the Court finds sufficient facts in the record to establish that Defendant had probable cause to effect Plaintiff's arrest. A police officer is not required to *know* a crime occurred at the time of arrest, rather, the Fourth Amendment "necessitates an inquiry into probabilities, not certainty." *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998). Thus, for probable cause to arrest Plaintiff here, Defendant would not have to have proof of each element of larceny in a building, but would have to believe that a probability existed that she committed the offense.

At the time Plaintiff was arrested, the following information had been gathered: (1) Frontera filed a complaint with the Warren Police Department alleging (a) that Plaintiff left Pearl Vision without paying for her Gucci eyeglasses, (b) that Pearl Vision made no less than five attempts to contact Plaintiff, and (c) that Plaintiff failed to return those calls or pay the balance on the eyeglasses; (2) Defendant interviewed Frontera as part of his investigation to confirm the contents of the complaint; (3) Defendant made numerous (unsuccessful) attempts to contact Plaintiff by calling her cell phone; (4) on June 3, 2010, while questioning Plaintiff, Defendant observed Plaintiff wearing eyeglasses that mirrored the description given by Pearl Vision; (5) Plaintiff confirmed to Defendant that she was wearing the Gucci eyeglasses at issue; (6) a representative from an unidentified banking institution verbalized over the telephone that Plaintiff tendered a payment to Pearl Vision on May 1, 2010, in the amount of $227.10; (7) Defendant called Pearl

10

Vision to confirm Plaintiff's exact balance; (8) Defendant was aware of a discrepancy between what Pearl Vision claimed Plaintiff owed and the receipts that Pearl Vision first faxed to Defendant; (9) Defendant received an updated fax of receipts accurately representing Plaintiff's residual balance; and (10) Defendant confirmed with Pearl Vision that Plaintiff should have paid that balance before leaving the store on May 7, 2010.

Even accepting Plaintiff's position at face value—that Defendant assumed Plaintiff paid *nothing* for the eyeglass, that she "confirmed" a payment with her bank, and that there was, at first, an initial discussion by Defendant and Pearl Vision over the exact amount owed—the totality of the facts and circumstances known to Defendant provided probable cause to arrest Plaintiff for larceny. Particularly, Pearl Vision's description of the Gucci eyeglasses, Plaintiff's confirmation to Defendant on June 3, 2010, that she was wearing those eyeglasses, and Defendant's verification with Pearl Vision that Plaintiff had an outstanding balance all combine to compel this finding. *See Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citation omitted) ("Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful."). Because there is no factual dispute that Defendant possessed probable cause, the Court fails to find that Plaintiff's "constitutional right has been violated." *Saucier*, 533 U.S. at 201. Thus, Defendant is entitled to qualified immunity as to Plaintiff's wrongful arrest claim.

**B. ILLEGAL SEIZURE OF PROPERTY**

In Count II, Plaintiff argues that Defendant unreasonably seized her Gucci eyeglasses in violation of the Fourth Amendment. The Fourth Amendment protects against "unreasonable" seizures of a person's "effects." *See* U.S. Const. amend IV. Generally, seizures of property require probable cause. *Bennett v. City of Eastpointe*, 410 F.3d 810, 825 (6th Cir. 2005). In the context of seizure of property from one's person, "probable cause means a reasonable ground for belief that the item seized is

11

contraband or evidence of a crime." *United States v. Baro*, 15 F.3d 563, 567 (6th Cir. 1994) (citing

*United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Place*, 462 U.S. 696 (1983)).  Because

the Court already concluded in Section IV, subsection A, *supra*, that Defendant had probable cause to

believe that Plaintiff had committed the crime of larceny in a building, he was permitted to seize the

evidence of that crime—Plaintiff's Gucci eyeglasses. *See Payton v. New York*, 445 U.S. 573, 587 (1980)

("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable

assuming that there is probable cause to associate the property with criminal activity.").  Defendant must

therefore be granted summary judgment with respect to Plaintiff's claim that seizure of the eyeglasses

violated her Fourth Amendment rights.

## V. CONCLUSION

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED that Defendant's

Motion for Summary Judgment [dkt 9] is GRANTED.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
Hon. Lawrence P. Zatkoff
U.S. District Judge

Dated:  September 10, 2013